# IN THE UNITED STATES DISTRICT COURT
# DISTRICT OF COLORADO

MATT WALEWSKI,
Individually and on behalf of all others similarly situated,

Plaintiff,

v.

WEYERHAEUSER NR COMPANY, D/B/A/ WEYERHAEUSER COMPANY, A
WASHINGTON STATE CORPORATION,

Defendant.

---

## CLASS ACTION COMPLAINT AND JURY DEMAND

---

1.      Plaintiff Matt Walewski, individually and on behalf of all others similarly situated, files this class action complaint against Defendant Weyerhaeuser NR Company ("Weyerhaeuser"), alleging as follows:

### INTRODUCTION

2.      Plaintiff brings this matter on behalf of himself and all others similarly situated to recover damages arising from high levels of formaldehyde off-gassing into homes containing fire resistant floor joists designed, manufactured, and sold by Weyerhaeuser.

3.      Plaintiff brings this action on behalf of both a national Class ("Class") and a Colorado Class ("Colorado Class"). When referred to together, the Class and the Colorado Class will be referred to as the "Classes."

1

## ALLEGATIONS

## Residential Building Requirements

4.    In 2012 the International Residential Code ("IRC") significantly changed fire protection requirements for floor systems above basements.

5.    One such change was a requirement that floor assemblies include a half inch gypsum wallboard membrane, a 5/8 inch wood structural panel membrane, or the equivalent on the underside of the floor framing member.

6.    Multiple jurisdictions have adopted requirements similar or identical to these 2012 IRC fire protection requirements.

## Weyerhaeuser's Response to the IRC Changes: Introducing the Trus Joist® TJI® Joists with Flak Jacket® Protection

7.    Weyerhaeuser is one of the largest private forest products companies and owners of timberlands in the world.

8.     In 2016 Weyerhaeuser reported generating sales in excess of $6.3 billion dollars.

9.    Part of Weyerhaeuser's business produces and sells wood products.

10.    In response to the 2012 IRC changes, Weyerhaeuser recognized that "[t]he new code will make homes safer, but complying may be problematic and more expensive. . . . But it doesn't have to be that way."[1]

11.    Thus, in an attempt to capitalize on this code change and increase its market share, sales, and profit margin, Weyerhaeuser developed an I-joist product intended to be a cheap fix: Trus Joist® TJI® Joists with Flak Jacket® Protection. An I-joist is

---

[1] http://blog.weyerhaeuser.com/simple-strategies-meet-ircs-new-fire-protection-requirements/

an engineered wood joist typically utilized in floor and roof joists, wall studs, and roof rafters in both residential and commercial construction.

12.    Without Weyerhaeuser's Flak Jacket product, builders and suppliers were still able to meet the IRC fire resistance standards by either installing compliant gypsum membranes to the underside of joists, or "using dimension lumber or structural composite lumber equal to or greater than 2-inch by 10-inch nominal dimension, or other approved floor assemblies demonstrating equivalent fire performance." IRC R 501.3, exception 4.

13.    Despite the availability of these other compliant products, Weyerhaeuser chose to develop and apply its "Flak Jacket" product to its TJI Joists to enhance fire resistance.

<u>**The Flak Jacket Coating**</u>

14.    Flak Jacket is a resin based chemical coating applied to wood that includes resin solids (Polymeric Phenol-Formaldehyde), Polymeric Diphenylmethane Diisocyanate, Fire Retardant, Titanium dioxide, and Paraffin Wax.

15.    In late 2016, Weyerhaeuser changed its Flak Jacket formula.

16.    Weyerhaeuser's change in formula was not necessary to comply with building codes.

17.    Rather, Weyerhaeuser's modification to the Flak Jacket formula was intended primarily to improve appearance and simplify installation of its TJI Joists.

18.    Although Weyerhaeuser has not publically stated the differences between the Flak Jacket formulas, Weyerhaeuser's safety data sheets demonstrate that, with

respect to the TJI Joists as a whole, the ingredient concentration ranges for Wood (wood dust, softwood or hardwood), Polymeric Diphenymethane Diisocyanate, Fire Retardant Coatings, and Titanium Dioxide are intended to be different when comparing the pre-December 2016 product to the post December 2016 product.

19.    Weyerhaeuser's safety data sheets also shows that the Resin Solids: Polymeric Phenol-Formaldehyde range was supposed to be the same for both products.

20.    Weyerhaeuser developed the Flak Jacket chemical.

21.    Weyerhaeuser owns the Flak Jacket chemical.

22.    Weyerhaeuser controls the Flak Jacket chemical.

23.    At all material times, Weyerhaeuser was responsible for the creation, production, manufacture, testing and application of the Flak Jacket chemical as a fire retardant on Weyerhaeuser's TJI Joists.

### Weyerhaeuser's Representations Regarding TJI Joists with Flak Jacket Protection

24.    Weyerhaeuser uniformly marketed and represented its TJI Joists with Flak Jacket protection as providing "high-performance flooring" meeting fire resistance regulations.

25.    On its website, Weyerhaeuser represented that its Joists offer "the high-performance flooring [consumers] rely on with fire-resistance that new regulations require," "do not require special handling," and are "backed by Weyerhaeuser support."

4

26.     The Weyerhaeuser sales brochures and marketing materials that were both distributed to the building trades professionals who installed the I-Joists and available to class members also touted the superior characteristics of the I-Joists.

27.     Weyerhaeuser, in its Material Data Safety Sheet for TJI Joists with Flak Jacket produced on and after December 1, 2016, states that "Weyerhaeuser has evaluated formaldehyde emission rates from its products and have found these rates to be below the significant risk level."

28.     Weyerhaeuser advertised and held out that its I-Joists carry a lifetime warranty.

29.     As a result, building trade professionals and consumers appropriately and reasonably relied on the warranty and representations to mean that the I-Joists will last a lifetime and need not be replaced during the service life of the home or other structure where the I-Joists were installed. *See* lifetime warranty attached as Exhibit 1.

30.     Plaintiff and the Classes' members, as well as the builders of their homes, relied on Weyerhaeuser's representations, including the lifetime warranty, regarding the TJI Joists when selecting, purchasing, and installing the joists in their homes.

## Formaldehyde Exposure and Regulations

31.     Formaldehyde is a colorless, flammable gas at room temperature.

32.     Formaldehyde has a strong odor.

33. The primary manner in which people are exposed to formaldehyde is by breathing in air containing off-gassed formaldehyde.

34. Formaldehyde is the type of toxic substance to which people may be exposed without knowing they are at risk.

35. Exposure to formaldehyde may cause adverse health effects, including irritation to the skin, eyes, nose, throat, and cancer.

36. "Nasal and eye irritation, neurological effects, and increased risk of asthma and/or allergy have been observed in humans breathing 0.1 to 0.5 ppm. Eczema and changes in lung function have been observed at 0.6 to 1.9 ppm."

(https://www.atsdr.cdc.gov/toxfaqs/tf.asp?id=219&tid=39)

37. High levels of exposure can cause cancer, including nasopharyngeal cancer and leukemia.

38. Various standards exist that govern the use of formaldehyde in consumer products. These standards include ANSI A208.2-2009, ANSI/HPVA HP-1-2009, and 40 CFR Part 770.

39. The Occupational Health and Safety Administration limits exposure to formaldehyde by workers to an average of 0.75 parts per million ("ppm") for an 8 hour workday during a 40 hour workweek.[2]

40. This type of limit is called a permissible exposure limit over a time weighted average (PEL-TWA), and applies to free gaseous formaldehyde.

41. OHSA's permissible exposure over short term exposure limits (PEL-STEL) for free gaseous formaldehyde is 2 ppm.

_____

[2] https://www.atsdr.cdc.gov/toxfaqs/tf.asp?id=219&tid=39

6

42.     The Association Advancing Occupational and Environmental Health (ACGIH) has set a ceiling limit for formaldehyde at 0.3 ppm.

43.     The U.S. Department of Housing and Urban Development limits emissions of formaldehyde in manufactured housing to less than 0.2 ppm for plywood and 0.3 ppm for particle board. (https://www.atsdr.cdc.gov/toxfaqs/tf.asp?id=219&tid=39)

44.     Weyerhaeuser's product does not comply with the aforementioned standards.

### Problems with Weyerhaeuser's TJI Joists with Flak Jacket

45.     Due to a defect in design, manufacture, and/or production of Weyerhaeuser's TJI Joists with Flak Jacket Protection, formaldehyde is off-gassing from the I-Joists at high levels.

46.     These levels of formaldehyde are above the exposure limits set by OSHA, ACGIH, and HUD as described above.

47.     Weyerhaeuser customers have complained about an odor in newly constructed homes.

48.     As a result of this off-gassing, residents in home have been able to detect a chemical and unpleasant odor in their homes.

49.     As a result of this off-gassing, many residents have experienced symptoms of exposure to formaldehyde, including itchy and burning eyes, noses, throats, and skin.

50.     In fact, what was supposed to be an easier and cheaper way to provide fire retardant protection in lieu of sprinklers and other materials turned out to be a dangerous and toxic substance poisoning people in their homes.

51.    As a result, the I-Joists need to be immediately repaired, removed, and replaced.

52.    The I-Joists with Flak Jacket have not lived up to Weyerhaeuser's lifetime warranty and representations of longevity, performance, and durability.

### Weyerhaeuser's Admission of Problems with Its TJI Joists with Flak Jacket, and Suggests Remediation or Replacement

53.    In a July 18, 2017 news release, Weyerhaeuser stated that its defective TJI Joists are primarily present in the basements of over 2,200 homes.

54.    The use of TJI joists was not limited to unfinished basements.

55.    In the same release, Weyerhaeuser stated that affected TJI Joists were all manufactured on and after December 1, 2016.

56.    Weyerhaeuser stated that it sold approximately $9.0 million of the Flak Jacket produce since December 2016.

57.    As a consequence of dangerous and noticeable levels of formaldehyde off-gassing from its joists, Weyerhaeuser initiated a public relations campaign.

58.    As part of the campaign, Weyerhaeuser states that TJI Joists with Flak Jacket manufactured on and after December 1, 2016 should either be remediated or removed from any construction in which they were installed and replaced with non-affected I-joists.

59.    However, these solutions have not been field tested or proven to be an effective remediation protocol.

60.    It is unclear from Weyerhaeuser's remediation proposal what the effect of removing and replacing joists will be on homes' structural integrity.

61.    Weyerhaeuser's remediation solution involves spray painting a laboratory tested solution, known as "W20115 Field Paint," on joists in the field that is intended to bond and contain the formaldehyde on the TJI joists.

62.    The W20115 Field Paint is a latex based paint that is supposed to include a compound that permanently binds formaldehyde.

63.    Weyerhaeuser's stated purpose in applying the W20115 Field Paint is "to significantly reduce emissions" of formaldehyde.

64.    Weyerhaeuser claims that the W20115 Field Paint has been laboratory tested to reduce formaldehyde emissions from its TJI Joists with Flak Jacket "to a level below 50 parts per billion ("ppb") based on ASTM D6007 small chamber test."

65.    After the suggested application, identifying product markings will not be visible, forever obscuring the fact that the affected joist is in the home.

5.    Paint shall be applied in multiple passes (as many as 9-10) to ensure a coverage of 18 mils wet. If paint is applied in multiple coats, verify that individual coat depth measurements total 18 mills wet.  Thickness verification shall be made using both of the following methods:
    a.    Wet mil gauge at least once for every 100 ft$^2$ of ceiling area.
    b.    The green Flak Jacket coating and black product markings should not show through the gray remediation paint (see photos below).



Source: TJI® Joists with Flak Jacket® Protection Scope of Work for Field Paint Remediation Method. Revised July 24, 2017.

9

66.    The remediation solution is to be applied in the field, despite the fact that Flak Jacket is not applied in the field, but rather, in a controlled factory setting.

67.    Weyerhaeuser does not apply Flak Jacket in the field, but, rather, in a controlled factory setting.

68.    Indeed, "Flak Jacket® is approved as a factory applied coating only. This requirement allows Weyerhaeuser to maintain precise control on the quality and application of the coating, and the process is audited by third-party inspectors."[3]

69.    Weyerhaeuser's field paint has not been tested in the field for effectiveness.

70.    Weyerhaeuser's field paint has not been tested in the field for durability.

71.    Weyerhaeuser's field paint has not been tested in the field for longevity.

72.    Weyerhaeuser's field paint is not guaranteed to last the life of the home.

73.    Weyerhaeuser's field remediation solution is not 100% effective with respect to stopping formaldehyde off-gassing.

74.    The costs associated with remediation or removing and replacing I-joists in construction will vary depending on the amount of I-joists in a project, the design of a project, and the stage of construction.

75.    Replacement and remediation with the field paint are not the only possible solutions to fix the formaldehyde problem.

76.    At least some builders, in conjunction with Weyerhaeuser, are investigating a cryo-blasting solution in which the Flak Jacket product is frozen and removed using dry ice.

---

[33] https://www.weyerhaeuser.com/files/document-library/1497973417_TB-828.pdf

77.     For homes that have the affected joists replaced, current residents will be forced to move out of their homes for significant periods of time.

78.     For homes that have the affected joists replaced but are not currently occupied, there will be significant delay to completion and ultimate move in date.

79.     For homes that are remediated, there will be significant delay in remediating all homes, leading to loss of use of the home and/or loss of use of the basement for extended periods of time.

80.     Delays caused by remediation and replacement will impact contracts between homebuilders and owners, causing damages and breach of contracts.

81.     For homes that are remediated, the defective product will remain in the home for the lifetime of the home unless later replaced.

82.     When homeowners seek to sell homes that once contained or still contain the Flak Jacket, it will be necessary to disclose that a toxic chemical is or once was on the premises. *See*, *e.g.*, *In re Estate of Gattis*, 2013 COA 145; *see also* Colorado Seller's Property Disclosure Form.

83.     On information and belief, the presence of the defective Flak Jacket joists in a home, even if remediated, will reduce the home's resale value.

84.     While homes still contain original TJI Joists with Flak Jacket, they are not fit for human habitation.

85.     Recognizing this, Weyerhaeuser has advised home residents that they should limit access to their basements to no more than 5 minutes at a time, with no more than 30 minutes spent in the basement per day.

86.    Given the toxic and dangerous nature of formaldehyde gas, as well as the ability of gas to move throughout a home even with a basement door closed, Weyerhaeuser's advisement is insufficient to protect residents.

87.    The only effective solution to protect the health and safety of residents, as well as property in the home that is exposed to formaldehyde gas, is to immediately replace or remediate, with an effective and tested solution, the affected Flak Jacket Joists.

88.    As part of Weyerhaeuser's express warranty, Weyerhaeuser states that it "will pay reasonable cost of labor and material for the repair or replacement of the covered Joists, not to exceed 3 times the original purchase price of the Joist."

89.    Weyerhaeuser's warranty does not provide sufficient remedies for the damages inflicted upon Plaintiff and the class members.

90.    The cost of proper remediation, replacement, or other solutions is likely to exceed 3 times the original purchase price of the Joists.

91.    Weyerhaeuser has set aside between $50 (fifty) and $60 (sixty) million to cover the cost of remediation.

92.    Weyerhaeuser indicates that at least $9 (nine) million worth of defective product has been sold.

93.    Weyerhaeuser itself has set aside over 5.5 (five point five) times the original cost of the affected product in spite of their own warranty guarantee.

94.    The cost of alternative housing during remediation and/or repair will exceed 3 times the original purchase price of the Joists.

95.    The loss of value in the home due to the presence of formaldehyde, which will need to be disclosed to future buyers, will exceed 3 times the original purchase price of the Joists.

## PARTIES, VENUE, AND JURISDICTION

96.    Plaintiff Matt Walewski is a resident of Colorado.

97.    Weyerhaeuser is a Washington State corporation licensed do to business in Colorado. Weyerhaeuser has listed its principal office with the Colorado Secretary of State as being located at 200 Occidental Avenue South, Seattle, WA 98104. Weyerhaeuser's registered agent for service is the Corporation Service Company, 1560 Broadway, Suite 2090, Denver, CO 80202.

98.    This court is vested with jurisdiction pursuant to 28 U.S.C. § 1332(d).

99.    The Classes' damages exceed $5,000,000.00, exclusive of interest and costs.

100.    Plaintiff, a Colorado resident, and class members are citizens of states other than Washington, the state in which Weyerhaeuser is principally located.

101.    Venue is appropriate in this court because a substantial part of the events giving rise to this lawsuit occurred in Colorado, and the property that is the subject of this action is located in Colorado. 28 U.S.C. §1391(b).

102.    Weyerhaeuser directly distributes its products in Colorado through a self-owned distributor located at 9115 E. 90th Avenue, Henderson, CO 80640.

103.    All conditions precedent to the filing of this class action have been satisfied.

## PLAINTIFF WALEWSKI'S HOME

104.    Plaintiff Matt Walewski purchased a home, located at 6736 Mariposa Court, Denver, Colorado 80221, on or about June 28, 2017.

105.    Plaintiff Walewski's home was built by Brookfield Residential Company.

106.    Plaintiff Walewski, along with his husband, closed on the home June 28, 2017.

107.    Prior to move in, Plaintiff Walewski and his husband completed several walkthroughs of the property during construction.

108.    During construction, the stairs to the basement were installed and Plaintiff Walewski and his husband did a walkthrough of the home including the basement.

109.    Plaintiff Walewski noticed an unknown smell in the basement during this walkthrough.

110.    Plaintiff Walewski was told that the smell was the normal smell for a home that was newly built.

111.    Plaintiff Walewski began suffering from burning watery eyes and coughing as a result of being in the basement during this walkthrough.

112.    Plaintiff Walewski was told of similar symptoms by his husband and his mother following the walkthrough.

113.    Plaintiff Walewski and his husband moved into the home on June 29, 2017, the day after closing.

114.    Plaintiff Walewski noticed the same smell and irritation after moving in.

115.    Plaintiff Walewski and his husband were hoping to purchase exercise equipment and use the basement as an in-home gym.

116.    However, given health concerns surrounding the presence of the odor in the basement, Plaintiff Walewski has been unable to do so.

117.    Plaintiff Walewski's unfinished basement was constructed using TJI Joists with Flak Jacket Protection.

118.    Plaintiff Walewski received formal notice of the defective joists on Friday, July 21, 2017 from the builder Brookfield Residential Co.

119.    This information was related through a phone call from a Brookfield employee.

120.    On or about Saturday, July 22, 2017, Plaintiff received written notice from Weyerhaeuser regarding the defective Joists.   .

121.    Plaintiff Walewski contacted Weyerhaeuser regarding this issue, and suggested that Mr. Walewski and his husband seek temporary housing, but that it was not required, and that the decision to vacate was up to each individual homeowner.

122.    Weyerhaeuser did not inform Plaintiff Walewski or his husband of any potential health risks of staying in the home.

123.    Weyerhaeuser merely suggested that the home's residents limit their time in the basement to five minutes or less.

124.    Unaware of the potential health risks, Plaintiff Walewski and his husband chose to remain in the home.

125.  Plaintiff Walewski and his husband now keep the windows in the basement open all day while home and only closes them during the evening.

126.  Plaintiff Walewski and his husband now limit any time in the basement, and severely restricts their presence in the basement.

127.  Plaintiff Walewski and his husband currently use the basement only to store limited belongings and a safe.

128.  Prior to purchasing the home, Plaintiff Walewski planned on potentially selling the home after approximately ten (10) years of occupancy.

129.  Plaintiff Walewski still plans to sell the home in approximately ten (10) years.

130.  Upon information and belief Plaintiff Walewski's  ability to sell his home due to the defective I-Joists and the off-gassing of the Formaldehyde has been severely affected and diminished and sustained a  loss in value on his home, including loss of equity, caused by the presence of formaldehyde in the home's floor joists.

131.  Plaintiff's builder notified Weyerhaeuser that his home contains TJI Joists with Flak Jacket manufactured on and after December 1, 2016.

132.  Weyerhaeuser has communicated directly with Plaintiff Walewski regarding the presence of TJI Joists with Flak Jacket manufactured on and after December 1, 2016.

133.  Weyerhaeuser is on notice that the defective joists are installed in Plaintiff's home.

134.    Weyerhaeuser is on notice that the defective product in Plaintiff's home violates Weyerhaeuser's limited warranty.

## CLASS ALLEGATIONS

135.    Plaintiff brings this action on behalf of himself and a national class of similarly situated persons pursuant to Fed. R. Civ. P. 23 ("Class"). The Class consists of:

> All persons in the United States who own, owned, or entered into a contract to purchase a home or other building that, at any time, contained Weyerhaeuser TJI Joists with Flak Jacket manufactured on and after December 1, 2016.

> Excluded from the Class are Defendant and its officers, directors, and affiliates; members of the judiciary and their staff to whom this action is assigned; and Plaintiff's counsel and staff.

136.    Plaintiff also brings this action on behalf of himself and a Colorado class similarly situated persons pursuant to Fed. R. Civ. P. 23 ("Colorado Class"). The Colorado Class consists of:

> All persons in Colorado who own, owned, or entered into a contract to purchase a home or other building that, at any time, contained Weyerhaeuser TJI Joists with Flak Jacket manufactured on and after December 1, 2016.

> Excluded from the Class are Defendant and its officers, directors, and affiliates; members of the judiciary and their staff to whom this action is assigned; and Plaintiff's counsel and staff.

137.    The Class and Colorado Class will be referred to collectively as the "Classes".

138.    The members of the Classes are so numerous and geographically dispersed throughout Colorado and the United States that joinder of all members is impracticable.

139.    Weyerhaeuser sold at least $9 million of the Flak Jacket product during the class period.

140.    The subject Flak Jacket product is present in at least 2,200 homes.

141.    While the precise number or identification of class members is presently unknown to Plaintiff, the identities of the Classes' members are ascertainable from records maintained by Weyerhaeuser, builders, and homeowners as well as by a combination of direct mail, public notice, or other means.

142.    Common questions of law and fact exist as to all members of the Classes and predominate over any question solely affecting individual members of the Classes. The questions of law and fact common to the Classes include the following:

    a.  Whether Weyerhaeuser properly tested the TJI Joists with Flak Jacket prior to production;

    b.  Whether Weyerhaeuser made unlawful and/or misleading toxicity representations and warranties with respect to TJI Joists with Flak Jacket;

    c.  Whether Weyerhaeuser's TJI Joists with Flak Jacket Protection are defective;

    d.  Whether Weyerhaeuser was negligent in the design, manufacture, and/or distribution of the TJI Joists with Flak Jacket Protection;

    e.  Whether the TJI Joists with Flak Jacket  fail to perform as advertised, marketed, and warranted;

    f.  Whether Weyerhaeuser breached its express warranties by advertising, marketing, and selling defective TJI Joists with Flak Jacket;

    g.  Whether Weyerhaeuser breached express warranties to the end users of its TJI Joists with Flak Jacket;

h.  Whether the disclaimers in Weyerhaeuser written express warranty are valid and enforceable;

i.  Whether Weyerhaeuser breached the implied warranty of merchantability;

j.  Whether Weyerhaeuser breached the implied warranty of fitness for a particular purpose;

k.  Whether Weyerhaeuser's TJI Joists emitted unsafe levels of formaldehyde into homes;

l.  Whether Weyerhaeuser knew of the defects with its TJI Joists before the Flak Jacket treated Joists left the factory;

m.  Whether Weyerhaeuser knew of the defects with its TJI Joists in advance of July 18, 2017 and delayed providing notice to builders and home owners;

n.  Whether Weyerhaeuser's proposed repair and remediation of TJI Joists are adequate to fix the problems with the joists;

o.  Whether Weyerhaeuser's proposed payment for repairs and of relocation expenses adequately compensates home owners for the damages inflicted by the presence of toxic gas in their homes;

p.  Whether Weyerhaeuser's TJI Joists, even if remediated, will continue to off-gas toxic gas into homes in the future;

q.  Whether Weyerhaeuser's conduct resulted in diminution of value to buildings containing its TJI Joists with Flak Jacket;

r.  Whether Weyerhaeuser's conduct resulted in damages, including but not limited to living and housing expenses for affected class members forced to relocate or delay their move-in date during remediation and/or replacement of the affected TJI Joists;

s.  Whether Plaintiff and the class members are entitled to compensatory damages;

t.  Whether Plaintiff and the class members are entitled to economic damages;

u. Whether Plaintiff and the class members are entitled to consequential damages;

v. Whether Plaintiff and the class members are entitled to ancillary damages; and

w. Whether Plaintiff and the class members are entitled to receive monitoring and testing in the future regarding formaldehyde levels.

143.  Plaintiff's claims are typical of the claims of the class members because Plaintiffs' home was built using Weyerhaeuser TJI Joists with Flak Jacket manufactured on and after December 1, 2016 containing Weyerhaeuser's modified Flak Jacket product. Plaintiff Walewski is asserting the same rights, making the same claims, and seeking the same relief for himself and for all other class members. Weyerhaeuser's unlawful, negligent, unfair and/or fraudulent actions concern the same business practices described herein irrespective of where they occurred or were experienced. Plaintiff Walewski and each class member sustained similar injuries arising out of Weyerhaeuser's conduct.

144.  Plaintiff Walewski will fairly and adequately protect the interests of the class members. Plaintiff Walewski has retained counsel who are competent and experienced in complex civil litigation matters, including class actions. Plaintiff Walewski and his counsel will prosecute this action vigorously.

145.  Class certification is warranted pursuant to Fed. R. Civ. P. 23(b)(3) because questions of law or fact common to the class members predominate over any questions affecting only individual members.

146.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy since, among other things, joinder of all members of the Classes is impracticable. Furthermore, the amounts at stake for many class members, while substantial, are not great enough to enable them to maintain separate suits against Defendant. The expense and burden of individual litigation makes it impractical for all class members to individually seek to redress the wrongs done to them. Such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would entail. No difficulties are likely to be encountered in the management of this class action that would preclude its maintenance as a class action, and no superior alternative exists for the fair and efficient adjudication of this controversy. The class members are readily definable from Defendant's records and will eliminate the possibility of repetitious litigation.

147.    Prosecution of separate actions by members of the Classes would create the risk of inconsistent or varying adjudications with respect to individual members of the Classes that would establish incompatible standards of conduct for Defendant.

**FIRST CAUSE OF ACTION**
<u>(Strict Products Liability)</u>

148.    Plaintiff incorporates all prior allegations as if fully set forth herein.

149.    Weyerhaeuser was a manufacturer of the TJI Joists with Flak Jacket.

150.    Weyerhaeuser was engaged in the business of selling TJI Joists with Flak Jacket for resale, use, or consumption.

151.    Weyerhaeuser sold the TJI Joists with Flak Jacket located in homes owned by Plaintiff and class members.

152.    The TJI Joists with Flak Jacket were and are defective and, because of the defect, the TJI Joists with Flak Jacket were and are unreasonably dangerous to persons who might reasonably be expected to use, consume, or be affected by the TJI Joists with Flak Jacket.

153.    The TJI Joists with Flak Jacket were defective because they off-gas noxious levels of formaldehyde into homes.

154.    The TJI Joists with Flak Jacket were defective because they off-gas toxic levels of formaldehyde into homes.

155.    The TJI Joists with Flak Jacket were defective because they off-gas dangerous levels of formaldehyde into homes.

156.    The TJI Joists with Flak Jacket were defective at the time they were sold by Weyerhaeuser and left Weyerhaeuser's control.

157.    The TJI Joists with Flak Jacket were expected to reach the consumers without substantial change in the condition in which they were sold.

158.    The TJI Joists with Flak Jacket did reach the consumers without substantial change in the condition in which they were sold.

159.    Plaintiff and class members are and were persons who would be reasonably expected to use, consume, or be affected by the TJI Joists with Flak Jacket.

160.    Plaintiff and class members have had injuries, damages, and losses.

161.    Plaintiff's and class members' injuries, damages, and losses include, but are not limited to, cost of repair and replacement of TJI Joists with Flak Jacket, loss of use of their homes caused by delay and/or relocation, diminution of value to their property, and exposure to above-standard levels of formaldehyde.

162.    The defect in the TJI Joists with Flak Jacket was the cause of Plaintiff's and class members' injuries, damages, and losses in an amount to be proven at trial.

### SECOND CAUSE OF ACTION
(Negligence – Manufacturers Liability)

163.    Plaintiff incorporates all prior allegations as if fully set forth herein.

164.    Weyerhaeuser designed, developed, formulated, tested, manufactured, and sold the TJI Joists with Flak Jacket.

165.    Weyerhaeuser was negligent by failing to exercise reasonable care in the design, development, formulation, testing, and manufacture of the TJI Joists to prevent the TJI Joists with Flak Jacket from creating an unreasonable risk of harm to the person or property of one who might reasonably be expected to use, consume, or be affected by the TJI Joists with Flak Jacket while they were being used in the manner that Weyerhaeuser might have reasonably expected.

166.    Weyerhaeuser owed Plaintiff and all class members a duty to design, develop, formulate, test, and manufacture a product that was fit for its intended use and does not off-gas noxious, toxic, or dangerous levels of formaldehyde.

167.    As part of this duty, Weyerhaeuser was required to disclose or warn the building trade professionals, homeowners, consumers, and the public at large of foreseeable risks associated with the installation and use of the Joints.

168.    The off-gassing of noxious, toxic, or dangerous levels of formaldehyde in a home creates an unreasonable risk of harm to persons or property.

169.    Plaintiff and class members were of those persons Weyerhaeuser should reasonably have expected to use, consume, or be affected by the TJI Joists with Flak Jacket.

170.    Plaintiff and class members sustained injuries, damages, and losses that were caused by Weyerhaeuser's negligence, while the TJI Joists with Flak Jacket were being used in a manner that Weyerhaeuser should have reasonably expected.

171.    The defect in the TJI Joists with Flak Jacket was the cause of Plaintiff's and class members' injuries, damages, and losses in an amount to be proven at trial.

## THIRD CAUSE OF ACTION
### (Negligence)

172.    Plaintiff incorporates all prior allegations as if fully set forth herein.

173.    Plaintiffs and class members sustained injuries, damages, and losses.

174.    Plaintiff's and class members' injuries, damages, and losses include, but are not limited to, cost of repair and replacement of TJI Joists with Flak Jacket, loss of use of their homes caused by delay and/or relocation, diminution of value to their property, and exposure to above-standard levels of formaldehyde.

175.    Weyerhaeuser owed Plaintiff and the class members a duty to design, develop, formulate, test, and manufacture a product that is fit for its intended use and does not off-gas noxious, toxic, or dangerous levels of formaldehyde.

176.    As part of this duty, Weyerhaeuser was required to disclose or warn the building trade professionals, homeowners, consumers and the public at large of foreseeable risks associated with the installation and use of the Joints.

177.    Weyerhaeuser was negligent in that it knew, or in the exercise of ordinary and/or reasonable care should have been aware of the dangerous defect of the TJI Joists with Flak Jacket and resulting off-gassing of Formaldehyde when installed and used under ordinary use in homes or other structures, which would be harmful to homeowners and visitors, including plaintiff and the class members.

178.    Weyerhaeuser was negligent in that it failed to use reasonable care to disclose the dangers of the defective product and provide adequate warnings or instructions to the building trades, homeowners, and the public about the foreseeable dangers and harmful effects that could result from the installation of the TJI Joists with Flak Jacket in residential homes and other structures.

179.    The off-gassing of noxious, toxic, or dangerous levels of formaldehyde from TJI Joists with Flak Jacket in a home or other structure creates an unreasonable risk of harm to persons or property.

180.    Purchasers and occupants of homes or other structures, such as Plaintiff and the class members, were not aware and could not have been aware that the TJI Joists with Flak Jacket were defective and that formaldehyde would off-gas from the Joists and endanger their health and wellbeing.

181.    Weyerhaeuser knew or had reason to know that that homeowners would not realize or appreciate the dangers from the off-gassing of the Formaldehyde from the

25

Joists, but, failed to warn them of these risks prior to the installation of TJI Joists with Flak Jacket in their homes and other structures.

182.    Weyerhaeuser's negligence was a cause of Plaintiff's and class members' injuries, damages, and losses.

183.    The defect in the TJI Joists with Flak Jacket was the cause of Plaintiff's and class members' injuries, damages, and losses in an amount to be proven at trial.

## FOURTH CAUSE OF ACTION
### (Breach of Express Warranty)

184.    Plaintiff incorporates all prior allegations as if fully set forth herein.

185.    Weyerhaeuser sold TJI Joists with Flak Jacket that were manufactured on and after December 1, 2016.

186.    Weyerhaeuser marketed, represented, and sold its TJI Joists with Flak Jacket to builders, contractors, subcontractors, and other users for installation in residential homes or other structures owned and purchased by plaintiff and the class members.

187.    Weyerhaeuser expressly represented, warranted, and guaranteed in writing that its TJI Joists with Flak Jacket were fit and suitable as building products with useful or service life equal to the lifetime of the structure in which the Joists were being installed. In other words, it warranted or guaranteed that the Joists would perform satisfactorily and last the life time of the structure. This promise, warranty, and/or guarantee became a basis of the bargain that led to the purchase and installation of the Joists in Plaintiff's and the class members' homes or other structures.

188.   Weyerhaeuser expressly warranted the TJI Joists with Flak Jacket "for adequacy of design values as published by Weyerhaeuser and against delamination or manufacturing defects for the lifetime of the structure. This limited warranty is transferable."

189.   Weyerhaeuser's warranty states that Weyerhaeuser "will pay reasonable cost of labor and material for repair or replacement of the covered Joists, not to exceed 3 times the original purchase price of the Joist."

190.   Weyerhaeuser further stated in its separate MSDS that it had evaluated formaldehyde emission rates from its products, and that the emission rates were below the significant risk level.

191.   Weyerhaeuser created additional express warranties for the Joists though its representations and guarantees in in its sales brochures, catalogs, websites, marketing materials, and MSDS sheets. These warranties are enforceable despite Weyerhaeuser's attempt to nullify them by disclaiming such warranties in their written limited warranty.

192.    The disclaimers, limitations, and exclusions in Weyerhaeuser's written limited warranty are unconscionable and unenforceable.

193.   Weyerhaeuser's written limited warranty fails its essential purpose because it limits recovery to  a multiple of three times (3x) the purchase price of the product when the costs of repair, replacement, and remediation of the product will far exceed three times the price of the product. In addition, Plaintiff and class members have suffered a diminution in property value of their homes or other structures. As

such, Plaintiff and class members are not limited by the terms of the express warranty and are entitled to recover all damages that they have sustained.

194.    Plaintiff and class members are persons who were reasonably expected to use, consume, or be affected by the TJI Joists with Flak Jacket.

195.    The TJI Joists with Flak Jacket were sold not as represented, marketed, and warranted.

196.    The TJI Joists with Flak Jacket do, in fact, off-gas formaldehyde at unacceptable levels, and are thus not adequate for their design values, and is defective in its manufacture.

197.    The TJI Joists with Flak Jacket are off-gassing dangerous levels of formaldehyde soon after installation and do not live up to lifetime guarantee and warranty.

198.    Weyerhaeuser breached its express warranties to Plaintiff and class members by designing, formulating, manufacturing, marketing, and selling TJI Joists with Flak Jacket that was defective, not fit for its intended use, and failed soon after installation of the product in the home or other structure.

199.    This breach of warranty caused Plaintiff and class members injuries, damages, and losses as described throughout the complaint.

200.    Weyerhaeuser is on notice of its breaches of warranties since it stated in its press release that the TJI Joists with Flak Jacket are defective.

201.    Within a reasonable time after Plaintiff discovered the breach of warranty, Plaintiff and/or Plaintiff and his builder, notified Weyerhaeuser of such breach of

28

warranty. In addition, builders and other homeowners across the country have put Weyerhaeuser on notice of its breaches of the warranties.

202.    The defect in the TJI Joists with Flak Jacket was the cause of Plaintiff's and class members' injuries, damages, and losses in an amount to be proven at trial.

## FIFTH CAUSE OF ACTION
### (Breach of the Implied Warranty of Merchantability)

203.    Plaintiff incorporates all prior allegations as if fully set forth herein.

204.    Weyerhaeuser designed, formulated, manufactured, and sold TJI Joists with Flak Jacket that were manufactured on and after December 1, 2016 knowing and intending that they would be used as Joists in the construction of Plaintiff's and Classes' homes.

205.    Plaintiff and class members are persons who were reasonably expected to use, have installed, or be affected by the TJI Joists with Flak Jacket.

206.    Weyerhaeuser was a merchant with respect to the type of product involved, i.e. Joists used in construction of homes or other structures.

207.    The TJI Joists with Flak Jacket were not of merchantable quality at the time of sale.

208.    In order to be of merchantable quality at the time of sale, Weyerhaeuser's TJI Joists with Flak Jacket would have had to be of the quality and fitness that would pass without objection by users, installers, contractors, and builders; be fit for their ordinary use and purposes for which the products are used for; and not off-gas improper levels of formaldehyde gas in homes once installed.

209.    Weyerhaeuser advertised, marketed, represented, and warranted its joists as fit for their intended use, safe, and without any significant off-gassing of formaldehyde.

210.    Weyerhaeuser's advertisements, marketing, representations, and warranties were misleading and incorrect.

211.    Weyerhaeuser breached its implied warranty of merchantability because the TJI Joists with Flak Jacket are not of merchantable quality and are not fit for their intended purpose or use as an I-Joist in a home or other structure.

212.    The warranty is enforceable despite Weyerhaeuser's attempt to nullify it by disclaiming such warranties in their written limited warranty. The disclaimers, limitations, and exclusions in Weyerhaeuser's written limited warranty are unconscionable and unenforceable.

213.     Weyerhaeuser's breach of the implied warranty caused Plaintiff and class members injuries, damages, and losses as set detailed throughout the complaint.

214.    Weyerhaeuser is on notice of its breaches of warranties since it stated in its press release that the TJI Joists with Flak Jacket are defective.

215.    Within a reasonable time after Plaintiff discovered the breach of warranty, Plaintiff and/or Plaintiff and his builder, notified Weyerhaeuser of such breach of warranty. In addition, builders and other homeowners across the country have put Weyerhaeuser on notice of its breaches of the warranties.

216.    The defect in the TJI Joists with Flak Jacket was the cause of Plaintiff's and class members' injuries, damages, and losses in an amount to be proven at trial.

## SIXTH CAUSE OF ACTION
### (Breach of the Implied Warranty of Fitness for a Particular Purpose)

217.   Plaintiff incorporates all prior allegations as if fully set forth herein.

218.   Weyerhaeuser sold TJI Joists with Flak Jacket that were manufactured on and after December 1, 2016.

219.   Weyerhaeuser impliedly warranted the TJI Joists with Flak Jacket to, inter alia, be fit for the particular purpose of being used as an I-Joist in a home including in an unfinished basement without endangering the health and safety of residents and visitors.

220.   In order to be fit for the particular purpose of being used as an I-Joist in a home, including in an unfinished basement, without endangering the health and safety of residents, Weyerhaeuser's TJI Joists with Flak Jacket would have had to not off-gas improper levels of formaldehyde gas in homes once installed.

221.   Plaintiff's and the class members' builders and installers used and/or installed the products for the intended use as floor joists, which was reasonably and foreseeably expected by Weyerhaeuser.

222.   Weyerhaeuser advertised and marketed its joists as fit for their intended use, safe, and without any significant off-gassing of formaldehyde.

223.   Weyerhaeuser's advertisements, marketing, and warranties were misleading and incorrect.

224.   Weyerhaeuser's TJI Joists with Flak Jacket off-gas formaldehyde at inappropriate, dangerous, or toxic levels.

225.    Plaintiff and class members' are persons who were reasonably expected to use, install, or be affected by the TJI Joists with Flak Jacket.

226.    The TJI Joists with Flak Jacket were not fit for the particular purpose for which they were warranted.

227.    Weyerhaeuser breached its implied warranty of fitness for a particular purpose because the TJI Joists with Flak Jacket are not fit for their intended purpose or use as an I Joist in a home or other structure.

228.    The warranty is enforceable despite Weyerhaeuser's attempt to nullify it by disclaiming such warranties in their written limited warranty. The disclaimers, limitations and exclusions in Weyerhaeuser's written limited warranty are unconscionable and unenforceable.

229.    Weyerhaeuser's breach of implied warranty caused Plaintiff and class members injuries, damages, and losses as set forth throughout the complaint.

230.    Weyerhaeuser is on notice of its breaches of warranties since it stated in its press release that the TJI Joists with Flak Jacket are defective.

231.    Within a reasonable time after Plaintiff discovered the breach of warranty, Plaintiff and/or Plaintiff and his builder, notified Weyerhaeuser of such breach of warranty. In addition, builders and other homeowners across the country have put Weyerhaeuser on notice of its breaches of the warranties.

232.    The defect in the TJI Joists with Flak Jacket was the cause of Plaintiff's and class members' injuries, damages, and losses in an amount to be proven at trial.

## SEVENTH CAUSE OF ACTION
### (Negligent Failure to Warn – Provision of Joists)

233.    Plaintiff incorporates all prior allegations as if fully set forth herein.

234.    Weyerhaeuser owed a duty to Plaintiff, class members, and builders to design, produce, manufacture, and provide a product reasonably free of defect.

235.    Weyerhaeuser had a duty to warn persons reasonably expected to be affected by its products of the foreseeable risks associated with use of and exposure to its TJI Joists with Flak Jacket.

236.    While providing its joists to Plaintiff's and class members' builders, Weyerhaeuser knew or should have known that its Joists, when used as directed for their intended purpose, could harm Plaintiff and class members.

237.    Weyerhaeuser failed to exercise reasonable care to warn Plaintiff, class members, builders, or those reasonably affected by the use of its TJI Joists of the dangers attendant with use of the product that a reasonable person would under the same or similar circumstances.

238.    Weyerhaeuser failure to exercise reasonable care to provide adequate warnings or instructions to builders, Plaintiff, or class members about the reasonably foreseeable dangers attendant with use of its product was negligent.

239.    The dangers attendant with use of Weyerhaeuser's TJI Joists with Flak Jacket were not open and obvious to Plaintiff or class members.

240.    The dangers attendant with use of Weyerhaeuser's TJI Joists with Flak Jacket were not known to Plaintiff or class members.

241.    Weyerhaeuser's negligent failure to warn was a cause of Plaintiff's and class members' injuries, damages, and losses as set forth throughout the complaint in an amount to be proven at trial.

## EIGHTH CAUSE OF ACTION
(Negligent Failure to Warn – Post Discovery Notice)

242.    Plaintiff incorporates all prior allegations as if fully set forth herein.

243.    Upon discovery that its TJI Joists with Flak Jacket were defective and resulted in off-gassing of formaldehyde, Weyerhaeuser owed Plaintiff and class members a duty to provide timely notice of the defective product and the dangers it posed to residents and visitors of the homes or other structures.

244.    Timely notice to Plaintiff and the Classes' members would have permitted Plaintiff and class members to take timely actions in response to the defect, including but not limited to moving out of the home, limiting access of persons to the basements where exposed joists are present, providing increased ventilation to the basement to prevent the buildup of formaldehyde in the home, cancelling or delaying move in dates for affected homes, cancelling or delaying closing dates on affected homes, and taking other mitigating steps to avoid exposure of persons and property to formaldehyde gas.

245.    While providing its joists to Plaintiff's and class members' builders, Weyerhaeuser knew or should have known that its Joists, when used as directed for their intended purpose, could harm Plaintiff and class members.

246.    Weyerhaeuser first provided notice to Plaintiff's and class members through a public relations campaign initiated with a press release on July 18, 2017.

247.    On July 13, 2017, Walker Emulsions prepared a Material Safety Data Sheet for the W20115 Field Paint that Weyerhaeuser is now proposing as a field fix for its defective TJI Joists with Flak Jacket.

248.    Weyerhaeuser knew that its TJI Joists with Flak Jacket were off-gassing formaldehyde at inappropriate levels before July 13, 2017.

249.    Despite knowing about the defect with its joists before July 13, 2017, Weyerhaeuser failed to provide notice to Plaintiff and class members.

250.    Despite knowing about the defect with its joists before July 13, 2017, Weyerhaeuser failed to provide notice to builders utilizing TJI Joists with Flak Jacket in Plaintiff's and class members' homes.

251.    Weyerhaeuser failed to exercise reasonable care to timely warn Plaintiff, class members, builders, or those reasonably affected by the use of its TJI Joists of the dangers attendant with use of the product that a reasonable person would under the same or similar circumstances.

252.    Weyerhaeuser's failure to exercise reasonable care to timely provide adequate warnings or instructions to builders, Plaintiff, or class members about the reasonably foreseeable dangers attendant with use of its product was negligent.

253.    The dangers attendant with use of Weyerhaeuser's TJI Joists with Flak Jacket were not open and obvious to Plaintiff or class members.

254.    The dangers attendant with use of Weyerhaeuser's TJI Joists with Flak Jacket were not known to Plaintiff or class members.

255.    Weyerhaeuser's negligent failure to warn was a cause of Plaintiff's and class members' injuries, damages, and losses as set forth throughout the complaint in an amount to be proven at trial.

## NINTH CAUSE OF ACTION
(Violation of the Colorado Consumer Protection Act)

256.    Plaintiff incorporates all prior allegations as if fully set forth herein.

257.    Weyerhaeuser engaged in a deceptive trade practice within the meaning of the Colorado Consumer Protection Act, Colo. Rev. Stat. section 6-1-105.

258.    A deceptive trade practice is one where, in the course of business, a person or company knowingly makes false representations as to the characteristics of its goods and/or represents that goods are of a particular standard and quality if the person or company knows or should know that they are of another.

259.    Weyerhaeuser knew or should have known that its TJI Joists with Flak Jacket were toxic, dangerous, and not of the quality advertised and marketed to builder, Plaintiff, and the Colorado Class prior to providing the Joists to builders to be installed in homes and other structures.

260.    Nonetheless, Weyerhaeuser warranted its TJI Joists with Flak Jacket were safe and appropriate for use in homes, and even stated that it had tested its products for formaldehyde off-gassing, and published that off-gassing was below the level of significant risk.

261.    Builders, contractors, installers, Plaintiff and members of the Colorado Class relied on the truth of Weyerhaeuser's statements, representations, guarantees, and warranties regarding the fitness and safety of the TJI Joists with Flak Jacket.

36

262.    However, they were deceived by Weyerhaeuser's deceptive trade practices and suffered damages and losses.

263.    Weyerhaeuser's deceptive trade practice occurred in the regular course of its business.

264.    Weyerhaeuser's deceptive trade practice significantly impacted the public as actual or potential consumers of Weyerhaeuser's goods.

265.    Plaintiff and the Colorado Class members were actual consumers of Weyerhaeuser's goods.

266.    Plaintiff and the Colorado Class members, and their respective builders, only chose and permitted the use of TJI Joists with Flak Jacket in their homes based on Weyerhaeuser's claim that the joists were fit and safe for use in their homes and other structures.

267.    Weyerhaeuser's deceptive trade practice caused actual damages and losses to Plaintiff and the Colorado Class as set forth throughout the complaint in an amount to be proven at trial.

## TENTH CAUSE OF ACTION
### (Violation of the Magnuson-Moss Warranty Act – 15 U.S.C. § 2301, et seq)

268.    Plaintiff incorporates all prior allegations as if fully set forth herein.

269.    Weyerhaeuser's TJI Joists with Flak Jacket are a consumer product pursuant to 15 U.S.C. § 2301(1).

270.    Weyerhaeuser is a supplier and warrantor as defined by 15 U.S.C. § 2301(4) and 2301(5).

271.   Weyerhaeuser's warranty is a written warranty under 15 U.S.C. § 2301(6)(A), 2301(6)(B) or both.

272.   Plaintiff and class members are consumers pursuant to 15 U.S.C. § 2301(3) because they are buyers of a consumer product, entitled to enforce the obligations of Weyerhaeuser's implied warranty against it under state law, and entitled to enforce Weyerhaeuser's written warranty.

273.   While Weyerhaeuser is on written notice of the problems with its TJI Joists with Flak Jacket, 15 U.S.C. § 2301(e) permits Plaintiff and class members to bring this class action without providing Weyerhaeuser notice and opportunity to cure until the court determines Plaintiff's representative capacity pursuant to Fed. R. Civ. P. 23.

274.   Weyerhaeuser is liable to Plaintiff and class members pursuant to 15 U.S.C. § 2310(d)(1) because it breached its written warranty as set forth above.

275.   Weyerhaeuser gave an implied warranty in connection with the sale of its TJI Joists with Flak Jacket as defined in 15 U.S.C. § 2301(7); namely, the implied warranty of merchantability. As a part of the implied warranty of merchantability, Weyerhaeuser warranted that its TJI Joists, *inter alia*, were fit for their ordinary purpose as a safe building product that complies with applicable laws and regulations. Pursuant to 15 U.S.C. § 2310(d)(1), Weyerhaeuser is liable to Plaintiff and class members, because it breached the implied warranty of merchantability as set forth herein.

276.    Pursuant to 15 U.S.C. § 2310(d)(1), Plaintiff and class members are entitled to recover the  following damages proximately caused by Weyerhaeuser's breaches of its written warranty and the implied warranty of merchantability: (a) direct economic damages at the point of sale in the amount of the difference in value between the value of the TJI Joists with Flak Jacket as warranted (the full purchase price) and the value of the TJI Joists with Flak Jacket as delivered ($0); and (b) consequential economic damages at the point of repair in the form of the cost of repair, replacement and/or removal of the affected joists.

277.    In addition, pursuant to 15 U.S.C. § 2310(d)(2), Plaintiff and class members are entitled to recover a sum equal to the aggregate amount of costs and expenses (including attorneys' fees based on actual time expended) determined by the Court to have been reasonably incurred by Plaintiff and class members in connection with the bringing and prosecuting this action.

## ELEVENTH CAUSE OF ACTION
### (Unjust Enrichment)

278.    Plaintiff incorporates all prior allegations as if fully set forth herein.

279.    Plaintiff and class members have conferred substantial benefits on Weyerhaeuser by purchasing TJI Joists with Flak Jacket.

280.    Weyerhaeuser has knowingly and willingly accepted the benefits conferred upon it by Plaintiff's and class members' purchase of TJI Joists with Flak Jacket.

281.    Weyerhaeuser knew or should have known that Plaintiff's and class members' payments were given and received with the expectation that Weyerhaeuser's TJI Joists with Flak Jacket would be as represented as warranted

– namely, that the joists would be fit for their intended use and not be harmful to the health of those occupying homes containing the joists.

282. It is unequitable for Weyerhaeuser to retain the benefit of payments under the circumstances described in this complaint.

283. Weyerhaeuser's acceptance and retention of these benefits under the circumstances described in this complaint is unequitable without payment of the value of this benefit to Plaintiff and class members.

284. Plaintiff and class members are entitled to recover all amounts, plus interest, that Weyerhaeuser wrongfully collected and improperly retained.

285. As a direct and proximate result of Weyerhaeuser's wrongful conduct and unjust enrichment, Plaintiff and class members are entitled to an accounting, restitution from and institution of a constructive trust disgorging all profits, benefits and other compensation obtained by Weyerhaeuser, plus attorneys' fees, costs and interest thereon.

## TWELFTH CAUSE OF ACTION
### (Declaratory Judgment pursuant to C.R.S. §§ 13-51-101, et seq. and 28 U.S.C. § 2201, et seq.)

286. Plaintiff incorporates all prior allegations as if fully set forth herein.

287. This is a claim for declaratory relief pursuant to C.R.S. §§ 13-51-101, et seq. and 28 U.S.C. § 2201, et seq.

288. Plaintiff, individually and as a representative of both a national class of similarly situated individuals and a Colorado class of similarly situated individuals, seeks a declaration of the rights and obligations of the parties to this action.

289.    Entry of a judgment by the court declaring the rights and obligations of the parties would end the uncertainty, insecurity, and controversy with respect to the rights, status, or other legal relations between and among all of the interested parties and promote the timely resolution of the remaining claims and the interests of justice.

290.    For these and other reasons, Plaintiff asks the court to declare that all Weyerhaeuser's TJI Joists with Flak Jacket manufactured on and after December 1, 2016 are defective as to their design, workmanship, materials, and labeling. Plaintiff further asks the court to declare that the defective nature of the TJI Joists with Flak Jacket is material and requires disclosure of the defect to all persons who own or owned the joists, or who have entered into agreements or contracts to purchase homes in which the TJI Joists are or were ever present.

291.    This requested declaratory relief will result in common answers that will efficiently adjudicate the controversy related to defective design of the TJI Joists and the reasons for their failure. Making such a declaration will eliminate the need for continued and repeated litigation with respect to these issues.

## PRAYER FOR RELIEF

Plaintiff, on behalf of himself and all others similarly situated, prays for judgment in their favor as follows:

  (a) Certification of a class action pursuant to Fed. R. Civ. P. 23 for a national class;

(b) Certification of a class action pursuant to Fed. R. Civ. P. 23 for a Colorado class;

(c) Appointment of Plaintiff as Class Representative, and undersigned counsel as Class Counsel;

(d) A declaration that all Weyerhaeuser TJI Joists with Flak Jacket manufactured on and after December 1, 2016 are defective;

(e) An order requiring Weyerhaeuser to provide notice to the class of the problems with its TJI Joists with Flak Jacket;

(f) An injunction against Weyerhaeuser prohibiting Weyerhaeuser from further selling, marketing, or distributing the subject joists;

(g) An injunction requiring Weyerhaeuser to, forthwith, remove and replace the affected joists in Plaintiff's and the class's homes with suitable replacements that comply with local building codes and that do not endanger the health and safety of residences after providing Plaintiff and the class the opportunity to choose which joists shall be installed;

(h) An award of compensatory damages to Plaintiff and the class as a result of the wrongs alleged herein;

(i) An award of all interest, statutory or moratory, allowed by law;

(j) An award of reasonably attorneys' fees and costs of suit herein;

(k) An order requiring Weyerhaeuser to account for and disgorge to the Classes all or a portion of the profits inequitably and improperly received from the

sale of the TJI Joists with Flak Jacket, or an order requiring full restitution to the class; and

(l) An order for such other and further relief as this court deems just and proper.

## **JURY DEMAND**

Plaintiff, on behalf of himself and all others similarly situated, demands a jury trial on all issues so triable.

Respectfully submitted this 10th day of August, 2017.

*s/ Keith R. Scranton*
Franklin D. Azar
Keith R. Scranton
Hugh Zachary Balkin
**FRANKLIN D. AZAR & ASSOCIATES, P.C.**
14426 East Evans Avenue
Aurora, CO 80014
Phone: 303.757.3300
Fax: 303.757.3206
azarf@fdazar.com
scrantonk@fdazar.com
balkinz@fdazar.com

Arnold Levin, Esquire
Daniel C. Levin, Esquire
Charles E. Schaffer, Esquire
**LEVIN SEDRAN & BERMAN**
510 Walnut Street, Suite 500
Philadelphia, PA  19106
Phone: (215) 592-1500
Fax: (215) 592-4663
alevin@lfsblaw.com
dlevin@lfsblaw.com
cschaffer@lfsblaw.com
